IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

VIVIAN JOHNSON, as surviving spouse and )
Personal Representative of the Estate of )
Leonard Wayne Johnson, Sr., Deceased, )
                                               )
                 Plaintiff, )
                                               )
v.                                               )        Case No. CIV-09-387-RAW
                                              )
UNITED STATES OF AMERICA, ex rel., )
the United States Department of Health & )
Human Services, as operator of W.W. )
Hastings Indian Medical Center, )
                                              )
                                              )
                 Defendant. )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

       This matter came on for non-jury trial on March 1-4 and March 7, 2011. Having considered the record as a whole, the court hereby enters its findings of fact and conclusions of law pursuant to Rule 52(a)(1) F.R.Cv.P.[1] To the extent a finding of fact constitutes a conclusion of law, the court adopts it as such. To the extent a conclusion of law constitutes a finding of fact, the court adopts it as such.

---

[1] The Tenth Circuit has stated that Rule 52 does not require the district court to set out its findings and conclusions in "excruciating detail." *OCI Wyo., L.P. v. PacifiCorp,* 479 F.3d 1199, 1204 (10th Cir.2007). This phrase precisely describes what the result would be if the court traced here the path the parties took in their meticulous delineation and explanation of the medical records in this case. The presentation by both sides was outstanding, but much of it seemed to based upon the premise that it was an open question whether Mr. Johnson had in fact contracted ehrlichiosis. In light of Dr. Benjamin's testimony (described below) the court sees no need to belabor that aspect of the case as tried.

Findings of Fact

1. This is an action brought by the plaintiff pursuant to the Federal Tort Claims Act, 28 U.S.C. §§2671 et seq. Plaintiff is Vivian Johnson, surviving spouse of Leonard Johnson ("Mr. Johnson").

2. Mr. Johnson was first seen at W.W. Hastings Indian Medical Center ("Hastings") on July 16, 2006. At the time, Hastings was operated by the United States Department of Health and Human Services and Indian Health Services. Hastings is located in Tahlequah, Oklahoma, which lies within the Eastern District of Oklahoma.

3. In Hastings's "fast track" clinic he was diagnosed with lumbar strain and sinusitis. He was found to have thrombocytopenia (low platelet count).

4. He was prescribed medication and sent home.

5. Mr. Johnson returned to Hastings on July 19, 2006. He was seen in the emergency room. He was then admitted into the hospital and the care of Dr. Charles Pradieu ("Dr. Pradieu"), an internal medicine physician, on July 20. Mr. Johnson was admitted into the ICU.

6. Mr. Johnson's condition had deteriorated considerably since July 16. Before arrival he had vomited large amounts of bright red blood and had previously vomited dark brown blood. He was again found to have thrombocytopenia and was found to have hyponatremia (low blood level of sodium). His symptoms included nausea, vomiting, confusion, headache, malaise (weakness), fever, myalgia and diarrhea.

7. Making his initial assessment on July 20, Dr. Pradieu recorded that Mr. Johnson admitted to drinking approximately 80 ounces of beer daily (and a higher amount on the weekend), but that his last drink had been the previous Thursday. Mr. Johnson was diagnosed with an upper GI (gastrointestinal) bleed. He had many symptoms consistent with alcoholism.

8. Upon being contacted by Dr. Pradieu, a surgeon (Dr. Pablo) performed an EGD (esophagogastroduodenoscopy). This procedure revealed blood in Mr. Johnson's esophagus and in his stomach. It also revealed a large adherent clot at the gastroesophageal junction. The clot was not removed for fear of additional bleeding. Tick-borne fever is not accompanied by gastrointestinal blood loss to the extent of Mr. Johnson's or such a low hemoglobin count as Mr. Johnson's. (Tr.855.17 – 856.4).

9. During that procedure on July 20, Mr. Johnson was placed on a ventilator. He remained on a ventilator until his death.

10. On July 21, Dr. Pradieu consulted with Dr. Gregory Felzien, an infectious disease specialist.

11. On July 28, Mr. Johnson underwent an abdominal echogram which revealed abnormalities in his gallbladder that were consistent with acalculous cholecystitis (a type of infection of the gallbladder).

12. Toward the end of July, Mr. Johnson developed acute respiratory distress syndrome (ARDS). He continued to deteriorate. He was transferred to St. Francis Hospital in Tulsa, Oklahoma on August 2.

13. The accepting physician at St. Francis was Dr. Shelbar. The history obtained at St. Francis was virtually identical to that at Hastings. Dr. Shelbar did not include a tick-borne illness in his differential diagnosis, just as the doctors at Hastings had not.

14. The infectious disease specialist at St. Francis, Dr. Grosserode, (who took a similar history), prescribed doxycycline on August 2. Mr. Johnson did not, however, show improvement despite receiving the drug for several days.

15. During his time at St. Francis, Mr. Johnson had his appendix removed, had a liver biopsy and ultimately had a cholecystostomy (the establishing of an opening in the gallbladder, usually for the purpose of drainage).

16. On August 5, lab results were obtained showing a possibility of ehrlichiosis in Mr. Johnson.

17. Mr. Johnson died on August 17, 2006.

Conclusions of Law

1. This court has jurisdiction over this action and venue is appropriate in the United States District Court for the Eastern District of Oklahoma.

2. The Federal Tort Claims Act incorporates "the law of the place where the act or omission complained of occurred," in this case Oklahoma. *See* 28 U.S.C. §1346(b).

3. Like all negligence claims, a *prima facie* case of medical negligence has three elements: (1) a duty owed by the defendant to protect the plaintiff from injury; (2) a failure to protect the plaintiff from injury; and (3) injuries to the plaintiff which are proximately

caused by the defendant's failure to exercise the duty of care. *Smith v. Hines,* 2011 WL 2322203 (Okla.2011).

4. The legal issues presented in this case are whether Dr. Pradieu and/or Dr. Felzien were negligent for failing to suspect and treat ehrlichiosis in Mr. Johnson, and whether such negligence was a proximate cause of Mr. Johnson's death.

5. The standard of care for a non-specialist (such as Dr. Pradieu) is that "a physician must use [his] best judgment and apply with ordinary care and diligence the knowledge and skill that is possessed and used by members of [his] profession in good standing engaged in the same field of practice at that time." *See* Oklahoma Uniform Jury Instructions, 14.1 (2009 ed.) (Westlaw database OK-JICIV).

6. The standard of care for a specialist (such as Dr. Felzien) is that "a specialist must use [his] best judgment and apply with ordinary care and diligence the knowledge and skill that is possessed and used by other specialists in good standing engaged in the same special field of practice at that time. This is a higher degree of knowledge and skill than that of a general practitioner." *Id.* 14.2.

7. Plaintiff contends that specifically establishing the standard of care in a case of this type is the Morbidity and Mortality Weekly Report (MMWR) published by the Centers for Disease Control (CDC) entitled "Diagnosis and Management of Tickborne Rickettsial Diseases: Rocky Mountain Spotted Fever, Ehrlichioses, and Anaplasmosis – United States" dated March 31, 2006 (Plaintiff's Exhibit 30). The court finds that adoption or rejection of this position is unnecessary to resolve the case at bar.

8. Plaintiff's contention as to the standard of care (as well as the other issues forming her case) is primarily based upon the testimony of plaintiff's expert, Dr. Rodney Snow. At trial, the court provisionally accepted Dr. Snow as a tendered expert, but stated the issue would be revisited at a later time. (Tr. 42.24 – 43.3); (Tr.291.21 – 292.4). The court now rules that Dr. Snow's testimony should be excluded, both on the grounds of qualification and reliability. (*See Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 969 (10th Cir.2001)(two-step analysis when district court assesses the admissibility of expert testimony)).

9. At one extreme, "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Id.* at 970. The court does not characterize Dr. Snow's qualifications this harshly. He is board-certified in both internal medicine and in infectious diseases. He has treated patients who had a tick-borne rickettsial disease. His testimony does, however, ultimately fail to satisfy this court in its "gatekeeper" function.

10. As to standard of care, for example, Dr. Snow had not reviewed the 2006 CDC report prior to Dr. Felzien's deposition in this case, almost a year after being retained as an expert witness in this case. (Tr. 285.17-21); (Tr.286.17-24)[2]. This court must consider whether the testimony was prepared for the purpose of the litigation or whether it was something the expert did in his ordinary practice. *See Granfield v. CSX Transp., Inc.,* 597

---

[2]Rule 702 F.R.Evid. permits a witness to be qualified as an expert on the basis of "education." The court is not persuaded that review of scientific materials, when such review is conducted solely for the sake of giving testimony in the case under litigation, satisfies the "education" component.

F.3d 474, 486 (1st Cir.2010).  In this instance, the court finds that the former category applies.  Since 2002, Dr. Snow has practiced at Baptist Wound Care and Hyperbaric[3] Medicine in Birmingham, Alabama.  His main practice is wound care, and he has not practiced in the field of internal medicine during that time.  He had never before given an expert opinion in a tick-bite illness case.  He had never before given an expert opinion in federal court, and in state court he had testified as to the standard of care only for (1) a surgeon and, on another occasion, (2) for an infectious disease doctor, although the subject did <u>not</u> touch on ehrlichiosis.

11.  Dr. Snow had last treated a patient who had a tick-borne illness in the 1990s.  The last time Dr. Snow had a patient with a gastric bleed was in the 1990s[4].  It is true that Dr. Snow published an article in 1995 which was entitled "Myocardial involvement in a Patient with Human Ehrlichiosis".  (Tr.318.23 – 319.1).  The court finds that the passage of sixteen years between that publication and the trial of this case (coupled with the path Dr. Snow's practice has taken) is also persuasive in concluding that his testimony should be excluded, both as to standard of care and causation.

12.  In the alternative, the court holds that even if Dr. Snow's testimony should not be excluded, it is entitled to reduced weight, based upon the same reasons described above.

---

[3] Hyperbaric medicine involves the use of oxygen for treatment.

[4] This facts lead the court to find Dr. Snow's testimony as to causation unreliable as well.  At best, it is entitled to considerably reduced weight on this basis.

13. Plaintiff's theory of liability as presented largely through Dr. Snow is as follows: Dr. Pradieu and/or Dr. Felzien (the "Hastings physicians") took an inadequate history from Mr. Johnson and/or his family. These Hastings physicians also employed an inadequate "differential diagnosis."[5] By failing to "suspect" ehrlichiosis and immediately treat with doxycycline (which is the "gold standard" or treatment of choice)[6], the Hastings physicians caused a delay, making Mr. Johnson's condition worse[7]. Then, Mr. Johnson's gallbladder was affected by the ehrlichiosis. (Tr.215.20-24). Ultimately, acalculous cholecystitis developed, which led to the decision to perform a cholecystectomy. (Tr.227.11-14). This procedure led to Mr. Johnson's demise. (Tr.248.2-6)(Tr.390.17-20). Thus, ehrlichiosis was not the direct cause of death but was the indirect cause. (Tr. 247.18-19). The conduct of Dr. Pradieu (Tr.180.21-25) and Dr. Felzien (Tr.191.7);(Tr.192.23 – 193.1) fell below the standard of care. Their failure was a proximate cause of Mr. Johnson's death. (Tr.257.14 – 258.4).

14. The defendant's expert witnesses responded to plaintiff's theory on each point. Regarding the CDC report as establishing the standard of care in a case of this type, Dr.

---

[5] This is the method by which a physician determines what disease process caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests and a thorough case history. *Best v. Lowe's Home Centers, Inc.,* 563 F.3d 171, 178 (6th Cir.2009).

[6] Mr. Johnson did receive levofloxacin, which can treat rickettsial disease. (Tr.555.25 – 556.1).

[7] (Tr.43.9-16);(Tr.132.23 – 133.3);(Tr.249.7-20);(Tr.256.23-25).

8

Benjamin testified it did not. (Tr. 553.1-4); (Tr.604.4-7)[8]. He referred to them as merely guidelines. Dr. Benjamin also testified that even with delay a patient usually responds to doxycycline within a day or two. (Tr.588.12-19);(Tr.589.9-22)(Tr.651.18-22)(Tr.726.21-25). Dr. Winfree also testified that delay does not usually lead to greater severity in ehrlichiosis. (Tr.952.21– 953.2). Dr. Benjamin testified ehrichiosis was not the cause (either direct or indirect) of Mr. Johnson's death. (Tr.555.15-16);(Tr.595.16-19);(Tr.732.14-16);(Tr.733.19-22)[9]. He explained his reasoning in detail. Dr. Winfrey testified that both Dr. Pradieu and Dr. Felzien met the standard of care. (Tr.780.1-10)(Pradieu); (785.20-23)(Felzien);(804.24 – 805.3)(both)[10]. Dr. Winfrey testified the cause of death was related to sepsis. (Tr.803.3-13).

15. The court will give a more extended discussion to the standard of care, as it consumed much of the parties' efforts in the trial. Further, in this *sui generis* case, under the record created the court finds it arguable that plaintiff satisfied her burden of proof on this element even with Dr. Snow's testimony excluded. The difficulty is the proper interpretation of the word "suspicion". As defense counsel correctly noted in passing at one point: "Suspicion is a broad term and I think everybody had a little different take on it."

---

[8] Plaintiff also argued that defendant's answer to an interrogatory constituted an admission on this point. (Tr.50-52). The court disagrees, as the literal language of the question and answer does not support this conclusion.

[9] *See also* Tr.586.9-11 ("So this is not a picture of someone who is in dramatic clinical deterioration from tick-borne disease.").

[10] The court reserved ruling on plaintiff's objection that Dr. Winfree was not qualified to testify regarding the standard of care for an infectious disease specialist such as Dr. Felzien. (Tr.754.9 – 756.7). Under the record as it developed, the court now overrules the objection.

(Tr.952.14-15).  The CDC report, as interpreted by Dr. Snow, requires treatment with doxycycline based upon a "mere suspicion" of ehrlichiosis.  (Tr.131.8-11).  Suspicion may be based upon the combination of epidemiological factors and symptoms.  (Tr.128.13-25); (Tr.146.20 – 147.10).  "Proof positive" of the disease is not required.  (Tr.129.1-6).  Dr. Snow also testified, however, that doxycycline need not be started immediately if there is a "low index of suspicion" for tick-borne illness.  (Tr.338.24 – 339.3).  The distinction between "mere suspicion" and "low index of suspicion" was not further clarified.  Dr. Winfree, on the other hand, rejected the "mere suspicion" standard.  (Tr.951.20-25).  He testified the requirement is a "high index of suspicion".  (Tr.952.9-12; 952.17-20).

16.  The court is persuaded that imposing a "suspicion" standard literally (as opposed to a formulation of, for example, "reasonable suspicion"[11]) in a case of this type is unworkable.  First, the testimony was consistent that tick-borne illness is a difficult disease to diagnose. (Tr.54.24 – 55.1)(Dr. Snow);(Tr.688.13)(542.19-22)(Dr. Benjamin);(Tr.793.11-15)(Dr. Winfree).  *See also* Plaintiff's Exhibit 30 at 2 ("Early signs and symptoms of these illnesses are notoriously nonspecific, or they might mimic benign viral illnesses, making diagnosis difficult.").  Thus, a "mere suspicion" standard logically could lead to a promiscuous use of doxycycline.  Dr. Benjamin explained that such use can have negative

---

[11]The standard of "reasonable suspicion" was not advanced by either party.  It appears in the CDC report (Plaintiff's Exhibit 30) at page 19.  Discussing a particular case history, the report states (in the first sentence after the question **"What actions, including treatment, should be taken?"**) as follows**:** "On the basis of history, clinical signs, geographic location, and time of year, suspicion of a TBRD is reasonable."  A standard of "reasonable suspicion" allows greater room for physician judgment, and helps avoid possible "defensive" medicine and the overuse of doxycycline.

consequences in terms of creating resistant pathogens and danger to other patients. (Tr.630.2 – 631.12). Dr. Benjamin explained that the doctors at St. Francis administered doxycycline (a fact plaintiff uses to show violation of the standard of care by the Hastings physicians) as probably being a case of "the therapeutics that are on board are not working, what else can I try?" (Tr.625.15-18). Dr. Winfree also viewed this conduct by St. Francis as "covering all the bases." (Tr.799.14 – 800.7). No treating physician either at Hastings or at St. Francis made a diagnosis of ehrlichiosis and the patient/family histories taken at the two hospitals did not largely differ. Under the "reasonable suspicion" standard, which the court hereby finds applicable, neither Dr. Pradieu nor Dr. Felzien violated the standard of care.

   17. This conclusion changes if the court is incorrect and the "mere suspicion" standard is found controlling. In that circumstance, and whether Dr. Snow's testimony on standard of care is admitted or excluded, the court is persuaded plaintiff's burden of proof has been satisfied as to a violation of standard of care. Defendant's own expert witness Dr. Benjamin testified that Mr. Johnson probably had ehrlichiosis. (Tr.614.4 – 615.21);(Tr.635.12-13);(Tr.741.20-21)[12]. Perhaps defendant would argue that this is a judgment made in retrospect and therefore does not necessarily support a finding that the Hastings physicians violated the standard of care, but the court finds such a conclusion

---

[12]Dr. Benjamin's statement that "I don't see ehrlichiosis" (Tr.733.20-22) was made in the causation context, not the standard of care context. Indeed, Dr. Benjamin stated that he would not testify as to standard of care, by which he evidently meant whether the Hastings physicians violated the standard of care. He did testify as to whether the CDC report established the standard of care.

strains logic. A defendant that has admitted through its own witness that a patient in fact had a disease faces a challenge in arguing that its physicians should not have even had a 'mere suspicion' of the disease[13]. Accordingly, in this alternative scenario, the court finds that (under the record presented) the Hastings physicians did violate the standard of care by failing to have a "mere suspicion" of ehrlichiosis.[14]

18. Finally, the court concludes that the plaintiff has failed to sustain her burden of proof as to causation, again even if Dr. Snow's testimony is not excluded. Most people infected with ehrlichiosis never become ill. (Tr.542.5-8). It is typically not a disease of great severity. (Tr.956.20-22). Dr. Snow testified that ehrlichiosis generally does not cause death. (Tr.319.21-23). One can develop sepsis as a result of ehrlichiosis but Dr. Benjamin did not believe "it fits in this case." (Tr.695.5-7). Mr. Johnson's liver presentation was not consistent with ehrlichiosis. (Tr.701.12-13). Neither the vomiting of bright red blood (Tr.771.22-24) nor Mr. Johnson's decline from July 16 to July 19 (Tr.777.14-18) were consistent with ehrlichiosis. Mr. Johnson had an abnormal liver function test in 2005, a year before the litigated events. (Tr.796.18-23). Mr. Johnson's liver function test revealed an elevation which was higher than the elevation normally seen in ehrlichiosis. (Tr.310.14 –

---

[13]The "mere suspicion" standard was articulated by Dr. Snow. Even if his testimony is excluded, however, Dr. Felzien came close to adopting it in his deposition, as referenced at trial. (Tr.906.9 – 907.4). Dr. Pradieu, as recalled by Dr. Winfree, did as well. (Tr.1023.8-14). Defendant did not present an alternative formulation.

[14]Under Oklahoma law, expert testimony is generally necessary to establish deviation from the standard of care. *Norman v. Mercy Memorial Health Center, Inc.,* 215 P.3d 841, 844 (Okla.Civ.App.2009). Here, even if Dr. Snow's testimony is excluded, the testimony of defense witnesses constitutes expert testimony establishing a basis for the inference of a deviation from the standard of care under a "mere suspicion" standard.

311.17).   As noted in paragraph 14 of this court's Conclusions of Law, Dr. Benjamin concluded that ehrlichiosis was neither the direct nor the indirect cause of Mr. Johnson's death[15]. The court found Dr. Benjamin to be a highly credible and conscientious witness and his testimony on the point is persuasive.

19.  To summarize and reiterate:  the court excludes Dr. Snow's testimony and rules that the "reasonable suspicion" standard is applicable as to standard of care.  Under those predicate rulings, plaintiff fails in her burden of proof as to violation of standard of care. Assuming *arguendo* that the "mere suspicion" standard is appropriate, however, the court finds that plaintiff has met her burden of proof as to violation of standard of care, whether Dr. Snow's testimony is excluded or admitted.  Regardless of the treatment of Dr. Snow's testimony, plaintiff has failed to meet her burden of proof as to causation.

20.   Accordingly, defendant is entitled to judgment as a matter of law.

**ORDERED THIS 21st DAY OF SEPTEMBER, 2011.**

Ronald A. White
United States District Judge
Eastern District of Oklahoma

---

[15]Dr. Snow testified that Mr. Johnson "clearly had something else" in addition to ehrlichiosis because of the GI bleeding.   (Tr.174.15-16).